HOWARD E. GREIMS

*v.*

JENNIE E. S. GREIMS.

[Decided May 12th, 1911.]

In a suit for divorce by a husband against his wife on the ground of her adultery, where the only debatable question is that of condonation, proofs examined and—*Held,* that it was established by the weight of the evidence that the husband *did* have marital intercourse with his wife, the defendant, after he "came into possession of the fact and proof," or, as it is otherwise said, after he had "reasonable knowledge," within the rule of law as to condonation.

*Mr. Cortlandt Parker,* for the petitioner.

*Mr. James R. Mulligan,* for the defendant.

STEVENS, V. C.

This is a suit for divorce on the ground of adultery. The adultery is charged to have been committed with one Young at York, Pennsylvania, between the 24th day of January and the 16th day of February, 1908. The evidence establishes the defendant's guilt and I need not review it. In my opinion, the only debatable question is that of condonation.

The law applicable to the facts proved in this case is thus stated by Bishop (*2 Bish. Mar. & D. (6th ed.) § 36*) :

"Where the husband comes into possession of the fact and proof that his wife has committed adultery, then if he has marital intercourse with her, the law presumes that he condoned the offence and refuses him divorce."

In this case it is, I think, established by the weight of the evidence that the husband *did* have marital intercourse with the defendant after he came into possession of the fact and proof, or as it is otherwise said after he had "reasonable knowledge." *Marsh*

v. *Marsh, 13 N. J. Eq. (2 Beas.) 281; Rogers* v. *Rogers, 67 N. J. Eq. (1 Robb.) 534.*

The parties were married in September, 1904. They lived, first, in Providence, Rhode Island, and then in several cities of the south. At the time of the acts complained of they were living at York, Pennsylvania. The petitioner was a railroad accountant, or auditor, and while at York, was employed by a New York firm to examine the accounts of the trolley system of that city. There he came in contact with the co-respondent, Young, its superintendent, and Young and his wife and the petitioner and his wife became close friends. About January 24th, 1908, the petitioner was called temporarily to New York and did not return until the sixteenth of the next month. The adultery was committed during his absence. On his return home he found lying on a bureau, in his wife's room, an amatory letter from Young, whose contents I shall state later. He called her attention to it and she said it was some of Dave Young's foolishness. She denied guilt and he says he believed her. They became reconciled and lived together for a year and a half and until a week before they separated, when the occurrences took place which I will have to detail at some length.

Mr. Greims left his wife on Sunday, August 1st, 1909. On the Sunday preceding, he says that his brother Merton told him that Mrs. Greims had told him (Merton) that Mrs. Young was down in York maintaining a legal residence to sue her husband for divorce and she was going to name Mrs. Greims as co-respondent. On that same day, Mrs. Greims says that she and her husband had a conversation, in the course of which she told him that he hadn't remembered her on her birthday—hadn't given her some cut glass for a present which he had promised; that he replied, "very sarcastically, your birthdays don't interest me any more"—that this made her angry and she threw a brush at him, upon which he turned to Marjorie, the little daughter, and said, "Never mind, Marjorie, you and papa won't have to stand this after the first of the month." Next day Mrs. Greims telephoned to her mother, Mrs. Davis. When Mrs. Davis reached the house petitioner requested her to take a walk with him. Mrs. Davis says that he opened the conversation by saying, "Mother, I am

going to leave Jennie;" that he then told her she had been named co-respondent in a divorce case and that he wouldn't live with a woman that had been named co-respondent; that he had known that Jennie had been unfaithful to him for more than a year and a half, and that he wanted her (Mrs. Davis) to take Jennie and her baby out of the house; that she told him she did not believe it and that he reiterated his statement.

On her return from the walk Mrs. Davis told Mrs. Greims what Mr. Greims had said. That evening, according to Mrs. Greims, she and her husband talked about the matter. She told him "he was wrong in everything;" he replied that the little baby, Jeannette, didn't look a terrible lot like him; that "he has been wise" that she had been unfaithful to him a year and a half, and that he accused her of all that he had accused her before. Then she adds, "1 was very nervous and excited and he harassed me and talked a while and said everything would be all right and that was all that was said that night."

On Tuesday the petitioner went to the office of Charles W. Mercier, his wife's uncle. Mr. Mercier says that after shaking hands, the petitioner said, "Uncle Charlie, I am going to leave Jennie. Would you see her and have her walk quietly out?" That he (Mercier) asked what the trouble was and petitioner replied, "Jennie has been crooked for a year and a half and I have known it." To the query, if such is the case you must have been a fool to live with a woman that long, knowing she was unfaithful to you, petitioner answered, "Well, I thought I would give her a chance." Mercier refusing to ask her to leave his home, petitioner walked off in a huff. After his interview he went to the office of his solicitors, Messrs. Cortlandt and Wayne Parker, and there talked the matter over with Mr. Minard. On his way home he and his brother met Mrs. Young, and, he testifies, she said to him:

"'Do you know that child is not yours?' I said [to quote his own words], 'Yes, I know it is not mine—she says that is Dave's; it is rumored that way all down in York,' and she says, 'I just came back from York; I am living with Dave again.' I says, 'Why. ain't you going to sue him for divorce?' She says, 'No, I took the matter up with Jerry Black. I had the detectives working on the case and I couldn't get any evidence and the lawyer down there told me I didn't have any grounds for divorce;'"

that he went back and told Mr. Minard what Mrs. Young had said and Mr. Minard "still advised him to wait."

On Wednesday defendant took her little girl, Marjorie, to New York and met petitioner by appointment, at Macy's store, where they bought some clothing for the children, and where they selected some cut glass that petitioner had promised to give her for a birthday present, Mr. Greims, stating that before buying it they had better wait until they moved to New York because it might be broken in the moving.

On Thursday evening Raphael, a friend of the family, called. He found Mr. and Mrs. Greims there, and also Merton Greims and Mr. Clader, the latter two gentlemen both, at that time, living with petitioner. The evening passed without incident.

Up to and including Thursday night, the petitioner admits that he slept with his wife and that he may have had sexual intercourse with her. He says that on Friday and Saturday nights he slept in the same bed but did not have intercourse.

On Friday Mr. Minard met Greims and Clader, by appointment, at the Delaware, Lackawanna station and they had a talk. Clader, so the petitioner says, told him that

"he was carrying notes back and forth from Mrs. Greims to Mr. Young and that Mrs. Greims had made a complete confession to him about the child not being a legitimate child and had told him she would be willing to tell Howard (the petitioner) everything except that she put it to Dave and had went the limit down to York, Pennsylvania,"

He says, somewhat incongruously,

"I didn't believe my brother's statement or Clader's statement; I couldn't see why a woman should talk to them about those things * * * Clader's statement either, because he has been a bosom friend of mine for ten years."

Then he adds,

"I decided to leave Mrs. Greims and to make an investigation to find out if what they had said was true. In fact I didn't know anything at all about it myself and would have to go down to York to find out whether what they really did tell me was true."

This evidence does not at all accord with either what he said to his mother-in-law on Monday, or his wife, or Mr. Mercier, or

Mrs. Young on Tuesday. He had told those four persons that he had known of his wife's unfaithfulness for a year and a half, and he had told Mr. Mercier, in addition, that the reason he had not left her before was because he wanted "to give her a chance." Somewhat strangely, he did not call Clader as a witness, although he was present in the court room, and although Clader's evidence would have been very material in supporting his main charge. It is possible that he did not call him because he was afraid that he would fix the date of giving the information at some earlier time. It is more than probable that Clader did, in fact, tell him what he knew before Friday, because he (petitioner) says in another part of his evidence that he ordered Merton and Clader out of his house on Wednesday, and that Mrs. Greims pleaded that they might remain. He did so, he says, because he had a fight with them about this very matter. "I told them I haven't got any facts only what *they* have told me." If Merton had been the only one to speak, he would not have ordered Clader out. And so, when he says that he first learned what Clader knew on Friday, he contradicts himself..

On Friday, too, he says he thought of the Young letter and took it from the little book in which he had preserved it.

On Saturday he returned from his work early and went after dinner, with his wife, brother and Clader, to a summer garden called the Cosmopolitan, where they spent the evening.

On Sunday morning, under pretence of taking Marjorie out for a walk and then to Sunday school, he left the house and did not return. In the course of the day he sent his wife the following letter:

"August 1, 1909.

"*Mrs. J. E. Greims, 178 N. 17th St., East Orange, N. J.:*

"Dear Jennie: I requested. my attorneys to commence legal proceedings against you to secure a divorce & you will be duly advised by them in connection therewith. In accordance with their advice, I have taken Marjorie with me and will provide for her. I enclose you my check No. 607 in the amount of $10 to cover immediate needs. I have arranged with my attorneys, Cortlandt & Wayne Parker, Room 810 Prudential Building, Newark, New Jersey, to provide you with funds for necessities pending judgment which money you can procure from time to time by calling on said attorneys. All matters which you desire to take up with me must be done through above attorneys.

"Yours very truly,

"H. E. GREIMS."

A week later he telephoned Raphael, a friend of the family, and after lunching with him, took him to Mr. Minard's office. Raphael testifies as follows:

"*Q.* Did he say anything about knowing that Mrs. Greims was unfaithful to him?

"*A.* Not at first. He told me that later on.

"*Q.* When was that?

"*A.* On the way from the restaurant to Mr. Minard's office.

"*Q.* What did he say?

"*A.* He told me that Mrs. Greims was unfaithful to him. Had been out with Mr. Young on several occasions in York.

"*Q.* Did he say he just found this out?

"*A.* No; he said he knew it for a year and a half."

As condonation, in the words of Chancellor Green, in *Marsh v. Marsh, supra,* may be implied, if the husband, after reasonable knowledge of the infidelity of his wife, continues to admit her as the partner of his bed, the question is, Does this evidence show that the husband had reasonable knowledge prior, at least, to Friday, July 29th? Up to that time, as I have said, he admits that he may have had intercourse with her.

It will be seen from his statements, already quoted and from others in his testimony, that his present position in this:

"Up to Friday I had suspicions, but nothing tangible on which to base them. On Friday I first heard Clader's statement of her admission of guilt. But I was informed by my solicitors that evidence of confession, standing alone, was insufficient; consequently, even at the time I left her I did not have reasonable knowledge, such as would have availed me in a court of justice, and it is only intercourse after *such* knowledge that amounts to condonation on my part."

Will the evidence bear out this contention? What proof had petitioner up to Friday, July 29th? I cannot accept petitioner's statements on this subject if they do not square with the whole body of the evidence. Before considering this question, it may be proper to advert to the state of the proofs when petitioner first testified on this particular subject. His wife had denied the adultery both in her answer and evidence. The putting in of proof on this question had occupied considerable time, the petitioner having taken depositions in York. Not until late in

the progress of the case was it apparent that the real contest would hinge, not on the question of adultery, but of condonation. It is evident that when petitioner came to realize this, his effort was, perhaps to some extent, unconsciously, to minimize his knowledge. This accounts for his confused and contradictory statements. Not only does his evidence ill accord with itself; it does not agree with an affidavit which he made in an earlier stage of the cause. He therein deposes as follows:

"On the first of August" [the words "first of August" being written over an erasure giving the date as the 24th of July], "nineteen hundred and nine your petitioner became informed of matters and things that seemed to corroborate former intimations and being informed *in such a manner as caused him to believe such information to be true* that his said wife had been unfaithful and had, on *various occasions,* committed adultery with one David Young, Jr., and others whose names are unknown to your petitioner, thereupon your petitioner secured such information as was available and caused it to be reduced to writing and signed by the persons making such statements and laid the same before his attorneys Cortlandt and Wayne Parker, and asked for their advice and *thereupon* left his wife."

This affidavit is most significant. He therein states that when he left his wife he had been informed, *"in such manner as caused him to believe such information to be true,"* that his wife had been unfaithful. But on the witness-stand he swore that at the time he left his wife, he did not believe either his brother's statement or Clader's statement; that he "left home with the intention of making investigations; *and if he found out it was true,"* he was going to bring a divorce. Not only is his affidavit inconsistent with his evidence, but it is also inconsistent with the letter he wrote his wife on the day he left. He does not say I have requested my attorneys to institute an investigation, but "I have requested my attorneys to commence legal proceedings against you to secure a divorce." This indicates that he then thought he had the necessary evidence.

But the affidavit is also significant in its further statement that

"he had secured such information as was available and *caused it to be reduced to writing and signed by the persons making such statements and laid the same before his attorneys."*

22

On his cross-examination he says that this was a mistake. It is not shown to have been a mistake by anyone but himself. If I have to choose between his evidence and his affidavit, I am disposed to take the latter. Its significance is manifest. He left early Sunday morning. ▸He does not pretend that he received any further information between Friday and Sunday. The question is whether he did not possess the information on which he acted before Friday. On cross-examination he admitted that his quarrel with his brother Merton and with Mr. Clader took place on Wednesday. This is his evidence: .

"*Q.* Did you order Mr. Clader and your brother out of the house Monday night?

"*A.* I ordered them out of the house about Wednesday night.

"*Q.* Then why didn't you take their room?

"*A.* Why, they didn't go.

"*Q.* Why didn't they go?

"*A.* Mrs. Greims pleaded with me not to let them go. They didn't have any place to go.

"By the Court—Why did you order them out of the house?

"*A.* We had a fight there; *an argument about something.*

"By the Court—About this matter?

"*A.* About this matter; and I told them I haven't got any facts, *only what they have told me,* and if I found out there isn't any truth in it, why there will be hell in camp. I said, you fellows better get out of here anyhow."

Notwithstanding this evidence, he says in another place that Clader didn't talk to him and that he didn't talk to Clader until they met Mr. Minard at the Delaware and Lackawanna station on Friday.

Sitting as a jury, with the right to draw such inferences as the whole evidence may warrant, I think that Greims did have "reasonable knowledge" of his wife's guilt as early as, or before, Thursday, July 29th. He admits, as I have said, that he may have had sexual relations up to and including Thursday night, and he says that he slept with her on the two following nights.

What evidence, then, did he have on Thursday? He had the following:

*First.* Young's letter found in his wife's possession on the night of his return to York in February, 1908. This letter reads as follows:

"Darling: Just a line. Why can you not buy the kimona? Do you need money? Answer Jennie darling and tell the truth.· You should keep no secrets from me, as I would not keep any from you. Have been tramping streets all day for a look 'at you. I have not been to Keech's, because I 'thought you asked me to keep away. Am going out again to find you if possible.

Yours,

"Love. Kisses. Hugs. DAVE."

*Second.* His wife's lame explanation of it as some of Dave Young's foolishness.

*Third.* His knowledge of Young's character. He says he himself while in York saw him through a keyhole hugging and kissing an actress.

*Fourth.* Mrs. Young's statement made to him on Tuesday that the baby was not his.

*Fifth.* Merton's statement that Mrs. Greims had told him that Mrs. Young was down in York maintaining a legal residence to sue her husband for divorce.

*Sixth.* Clader's statement that he (Clader) was carrying notes back and forth from Mrs. Greims to Mr. Young (this must have occurred, if at all, in East Orange, where they all lived), and that Mrs. Greims had made a complete confession to him about the child not being a legitimate child. I include Clader's statement because of the contradictions in Greims' evidence, heretofore adverted to, making it probable that Clader, who lived with Greims, had told him what he knew before the interview at the Lackawanna station.

As bearing upon the question of his knowledge, we have further:

*First.* Raphael's statement of what Greims told him in the conversation that took place a week after Greims left his home, viz., that (Greims) had been under advice of counsel (not necessarily Messrs. Cortlandt & Wayne Parker) for several months, and that Mrs. Greims was unfaithful to him (Greims) and had been out with Mr. Young *"on several occasions in York,"* and that he had known of it for a year and a half.

· *Second.* Greims's statement to Mrs. Davis that he had known that Jennie had been unfaithful to him for more than a year and a half, and to Mr. Mercier that "she had been crooked· for a year

and a half, and I have known it." * * * "I thought I would give her a chance."

*Third.* Greims's affidavit, in which he states,

"that he had been informed in such a manner as caused him to believe such information to be true that his said wife had been unfaithful and had *on various occasions* committed adultery with one David Young, Jr.,"

and in which he also states that he had "caused such information to be reduced to writing and signed by the persons making such statements." Statements by different persons, signed and sworn to, are not obtained in a moment. When they were signed and sworn to does not appear, for he did not produce, or offer to produce, them in evidence. On the contrary, he says, in his evidence, there were no papers laid before his attorneys, but he does not say he had not procured them.

*Fourth.* His letter to Mrs. Greims showing that he then (August 1st) thought his proof sufficient to warrant him in commencing legal proceedings.

Of course, it may be argued that when Greims said to the different witnesses that he *knew* of his wife's infidelity, he had in mind moral conviction, not legal proof. Sitting as a jury, I think I am justified in finding, under the facts proven, that when he said he *knew*, he had more than moral conviction; that he had facts sufficient to constitute a *prima facie* case.

He had, as I think, his wife's confession to Clader. This standing alone is not sufficient proof. *Kloman* v. *Kloman, 62 N. J. Eq. (17 Dick.) 153.* But confessions fortified by other evidence may be convincing. *Jones* v. *Jones, 17 N. J. Eq. (2 C. E. Gr.) 351.* He had other incriminating facts, such as Young's known character, his amatory letter and his wife's unsatisfactory explanation of it; a subsequent clandestine correspondence carried on through Clader, assuming, of course, that petitioner correctly testified to what Clader had told him; abundant opportunity for meeting, and, in addition, Mrs. Young's accusation, which may or may not have been based, in whole or in part, on actual knowledge. As bearing upon the question of what he knew we cannot disregard Greims's own repeated declarations that he had long known of his wife's guilt and that *persons* (not one person) had

given him information which had been reduced to writing and signed. This evidence would, I think, justify a jury in imputing to him "reasonable knowledge" as early as Wednesday or Thursday.

It may be asked why, if Greims had this knowledge, he did not leave his wife sooner. It is difficult to explain his conduct on any reasonable theory. According to the evidence which he last gave, he left, not because he had ascertained her guilt, but because he wanted to investigate. He says he did not leave on Saturday, because "they" had Marjorie under surveillance—a statement quite improbable. His departure was an entire surprise to his wife, and she herself, on Sunday morning, gave Marjorie into his hands to take her out for a walk. He seems to have accused his wife in the early part of the week and then, apparently, to have made up with her. I say "apparently," for his visits to his lawyers, and his declaration to Mr. Mercier, indicate a fixed purpose of leaving her. He seems to have thought that he could leave her at his own convenience—that he could cohabit with her and yet, while cohabiting, resolve to repudiate her. The evidence, I regret to say, does not indicate that he possessed any very nice sense of honor. The day after he had read Young's letter, instead of showing resentment, he, as he himself admits, played cards with him. He knew Young's character and what he had written, and yet when the two families had taken up their residence in East Orange, he told his wife—probably because he thought Young's acquaintance would, from a business standpoint, be of advantage to him—to treat him like a prince. Taking his own admissions, he slept in the same bed with his wife for two nights after Clader had told him of her confession. Under these circumstances, the fact that he did not leave sooner is not, of itself, of much weight.

The defendant throughout denied her guilt. If the petitioner had believed her he could not be charged with condonation. But I think the weight of the evidence is that he believed her guilty and yet had intercourse with her. The case is thus brought under the rule stated in the beginning of this opinion.

While the case is not without difficulty, I think the finding is not only in accord with the evidence, but with the ends of justice.

Outside of what Clader told him about an interchange of letters (and Clader is not called as a witness to prove it) there is nothing in the proofs to indicate that Mrs. Greims was not, after the episode at York, true to him or that she did not discharge all her wifely duties to his satisfaction. If what he says in his affidavit be true, he lived happily with her for a year and a half.

I think the petition should be dismissed, with costs.